UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Cargill, Incorporated,<br><br>    Plaintiff<br><br>v.<br><br>National Union Fire Insurance Company of Pittsburgh, Pa.,<br><br>    Defendant. | Civil File No.:_____<br><br><br><br>**COMPLAINT** |

Plaintiff, Cargill, Incorporated ("Cargill"), as and for its claim against Defendant, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), states and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201, in which Cargill seeks an adjudication of its rights under a Commercial Crime Policy issued by National Union. Cargill seeks a declaration that it is entitled to coverage for a Loss it incurred as a result of a bribery and kickback scheme (the "Scheme") perpetrated jointly by certain former employees of Cargill and a vendor of Cargill – found liable for theft by a jury in a civil trial and criminally pursued with prison sentences being presently served – which resulted in $44.7 million in overcharges to Cargill.

2. Declaratory Judgment is appropriate because Cargill has sought insurance coverage from National Union for the entire amount of "Loss" that it sustained as a result of the Scheme and National Union has disputed that it has any obligation to provide such coverage. Specifically, National Union has recognized only a fraction of the $44.7 million in overcharges as covered

"Loss." To date, National Union has made no payment to Cargill under the Crime Policy. Cargill seeks a declaration that National Union owes coverage for the entire amount of the overcharges resulting from the Scheme.

3. Cargill also brings a cause of action for breach of contract and seeks amounts that National Union owes it under the Commercial Crime Policy.

## PARTIES

4. Cargill is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Minnesota.

5. Upon information and belief, National Union is an insurance company authorized to do business in Minnesota, organized and existing under the laws of the Commonwealth of Pennsylvania, and with a principal place of business in New York.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and there is complete diversity between the parties.

7. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district, and the Commercial Crime Policy at issue was issued to Cargill in this district.

## FACTUAL ALLEGATIONS

**I.    The Crime Policy**

8. National Union issued to Cargill Commercial Crime Policy No. 01-613-57-14, with an effective period of October 1, 2014 to June 15, 2016 (the "Crime Policy"). A true and correct copy of the Crime Policy is attached as <u>Exhibit A</u>.

9. The Crime Policy was issued to Cargill at its principal place of business in Wayzata, Minnesota.

10. The Crime Policy affords coverage under a number of different insurance agreements, including "Employee Theft" and "Computer Fraud."

11. The Crime Policy provides limits of $25 million per occurrence.

12. A deductible of $10 million per occurrence applies to the Crime Policy.

13. The Crime Policy affords coverage for "loss that you sustain resulting directly from an 'occurrence' taking place at any time which is 'discovered' by you during the Policy Period shown in the Declarations . . ."

14. With respect to "Employee Theft," Insuring Agreement A.1. provides:

> We will pay for loss of or damage to "money," "securities" and "other property" resulting directly from "theft" committed by an "employee," whether identified or not, acting alone or in collusion with other persons.

15. For the purposes of this Insuring Agreement, "theft" shall also include forgery.

16. With respect to "Computer Fraud," Insuring Agreement A.6 provides:

> We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":
>
> a. To another person (other than a "messenger") outside those "premises"; or
> b. To a place outside those "premises".

17. The Crime Policy defines "employee" to include "[a]ny natural person . . . while in your service and for the first 30 days immediately after termination of service, unless such termination is due to 'theft' or any other dishonest act committed by the 'employee. . .'"

18. The Crime Policy defines "money" as "currency, coins and bank notes in current use and having a face value;" and "Travelers checks, register checks and money orders held for sale to the public."

19. With respect to Employee Theft, the Crime Policy defines "occurrence" as:

(1) An individual act;

(2) The combined total of all separate acts whether or not related; or

(3) A series of acts whether or not related; committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

20. With respect to Computer Fraud, the Crime Policy defines "occurrence" as:

(1) An individual act or event;

(2) The combined total of all separate acts or events whether or not related; or

(3) A series of acts or events whether or not related; committed by a person acting alone or in collusion with other persons, or not committed by any person during the Policy Period shown in the Declarations, before such Policy Period or both.

21. The Crime Policy defines "other property" as "any tangible property other than "money" and "securities" that has intrinsic value. 'Other property' does not include computer programs, electronic data or any property specifically excluded under this policy."

22. The Crime Policy defines "securities" as negotiable and nonnegotiable instruments or contracts representing either 'money' or property and includes:

a. [t]okens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you; but does not include "money".

23. The Crime Policy defines "theft" as "the unlawful taking of property to the deprivation of the insured."

24. The Crime Policy defines "banking premises" as "the interior portion of any building occupied by a banking institution or similar safe depository."

25. The Crime Policy defines "premises" as "the interior of that portion of any building to occupy in conducting your business."

26. With respect to Valuation, the Crime Policy provides, in relevant part, "The value of any loss for purposes of coverage under this policy shall be determined as follows: (a) Loss of 'money' but only up to and including its face value."

**II.    The Scheme**

27. Women's Distribution Services ("WDS"), a warehousing and distribution company, was a supplier of Cargill.

28. In 2008, Michael Kennedy, an employee of Cargill, encouraged Cargill to enter into a supply agreement with WDS.

29. In 2009, Kennedy encouraged WDS to request a credit line from Cargill. Between 2009 and 2016, Kennedy continued to promote WDS and related entities within Cargill in order to profit from his relationship with WDS at the expense of Cargill.

30. Beginning in September 2009, Cargill expanded the scope of products it received from WDS to include safety items, cutlery, stretch films, plastic bags, cover sheets, and other packaging products.

31. Beginning in 2009, the agreements between WDS and Cargill contained a pricing mechanism that required Cargill to pay WDS a fixed margin over any vendor's invoice.

32. On February 1, 2012, Cargill renewed its agreement with WDS. The new agreement allowed a range of markups depending on the category of supplied product and pursuant to a markup table in the agreement.

33. The markup process relied on WDS to provide correct invoice amounts. Cargill buyers would place orders with WDS for items needed, using the most recent price for that good from previous purchases, which was stored in Cargill's electronic purchase order system.

34. Cargill buyers would then request that WDS confirm the pricing, quantity and delivery date.

35. WDS would either handwrite changes or confirm the details in the purchase order request, and then email the request back to Cargill. The Cargill buyers would then edit the data in the Cargill system to reflect any changes and issue an official Purchase Order.

36. WDS would not provide the underlying invoices or invoice prices from the original vendor; rather, WDS would simply provide the final "WDS price".

37. The final "WDS price" should have been the price from the vendor plus the agreed-upon markup.

38. In fact, Kennedy, Cargill employee Shawn Nguyen, and various WDS employees, including WDS' founders, Jennifer Maier and Brian Ewert, colluded to overcharge Cargill for various products.

39. From 2009 through the discovery of the Scheme in 2016, Kennedy and Nguyen took various steps to prevent others at Cargill from discovering the Scheme. These steps included, but were not limited to, ignoring concerns from lower-level employees, pretending to conduct audits, and preventing other companies from including products handled by WDS in bids for Cargill's business.

40. In exchange for their cooperation in the Scheme, Kennedy and Nguyen were compensated by Maier, Ewert, and/or WDS, in the form of all-expense paid vacations and gifts.

41.     In addition, Kennedy, Nguyen, Maier, and Ewert split the amounts obtained from the overcharges.

42.     Cargill discovered the Scheme in 2016.

43.     Once the Scheme was discovered, WDS and the four co-conspirators colluded to falsify past invoices and otherwise conceal the extent of the Scheme.

44.     Kennedy and Nguyen were fired as a result of their participation in the Scheme.

45.     In March 2019, Ewert, Maier and Nguyen pled guilty to Conspiracy to commit wire fraud in connection with their participation in the Scheme.

46.     In connection with their pleas, Ewert, Maier and Nguyen admitted to concealing more than $35 million in overcharges.

47.     During a civil trial related to the Scheme, Cargill presented expert testimony and evidence calculating the loss to Cargill at $44.7 million, evidence which has been provided to National Union.

### III.    The Insurance Claim

48.     Once Cargill discovered the Scheme, it gave timely notice to National Union and sought coverage under the Crime Policy.

49.     Because Cargill paid $44.7 million in charges it otherwise should not have paid, the loss to Cargill is $44.7 million.

50.     Cargill has complied with all conditions to coverage under the Crime Policy.

51.     Although Cargill has presented National Union with a sworn proof of loss, National Union has recognized only a fraction of the $44.7 million as covered loss.

52.     To date, National Union has made no payment under the Crime Policy.

## COUNT I – DECLARATORY JUDGMENT

53. Cargill restates and realleges the foregoing paragraphs of this Complaint as if set forth fully herein.

54. An actual controversy exists between Cargill and National Union with respect to the rights and obligations of National Union under the Crime Policy in connection with the Scheme.

55. The Crime Policy affords coverage for among other things, "loss of . . . money . . . resulting directly from 'theft' committed by an 'employee' . . .acting alone or in collusion with other persons."

56. As a result of the Scheme, and the theft committed by Kennedy and Nguyen in collusion with WDS, Cargill suffered a financial detriment and loss of $44.7 million, an amount in excess of the deductible and total limits of the Crime Policy.

57. In addition, the Crime Policy affords coverage for "loss of . . . "money" . . . resulting directly from the use of any computer to fraudulently cause a transfer of that property . . ."

58. WDS used computer systems to overcharge Cargill. As a result of the Scheme, Cargill suffered a financial detriment and loss of $44.7 million, an amount in excess of the deductible and total limits of the Crime Policy.

59. Cargill is entitled to a declaration that the Crime Policy affords coverage for the losses Cargill suffered as a result of the Scheme.

## COUNT II – BREACH OF CONTRACT

60. Cargill restates and realleges the foregoing paragraphs of this Complaint as if set forth fully herein.

61. The Crime Policy was in full force and effect at the time Cargill discovered the Scheme.

62. Cargill provided National Union with timely notice of its claim in 2016, as required by the Crime Policy.

63. Cargill further complied with the Crime Policy's requirement to submit a proof of loss, kept National Union informed of the various criminal and civil cases resulting from the Scheme, and provided National Union with requested evidence to support the amount of loss Cargill claimed as a result of the Scheme.

64. Cargill has complied or substantially complied with all conditions to coverage.

65. To date, National Union has made no payment under the Crime Policy.

66. Moreover, to date, National Union has recognized only a small fraction of the loss sustained by Cargill as covered loss.

67. As a result, National Union is in breach of its obligations under the Crime Policy.

68. As a direct and proximate cause of National Union's breaches, Cargill has suffered and continues to suffer damages, including but not limited to the amounts payable under the Policy, loss of use of funds, and other foreseeable damages, including pre-judgment interest.

**WHEREFORE,** Cargill prays for a Judgment of this Court:

a. Declaring that the Crime Policy affords coverage for the full amount of Cargill's losses resulting from the Scheme, and that National Union must pay the full limits, $25 million, under the Crime Policy;

b. Awarding Cargill compensatory damages in the amount of the full limits available under the Crime Policy, as well as pre-judgment interest under Minn. Stat. § 60A.0811; and

c. Ordering such other relief as the Court shall deem just and equitable.

## JURY DEMAND

Cargill hereby demands a trial by jury as to all issues so triable.

Dated: November 24, 2021  **MASLON, LLP**

By: *s/ Rikke Dierssen-Morice*
Rikke Dierssen-Morice (#0237826)
Bryan R. Freeman (#0387154)
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 672-8200
rikke.morice@maslon.com
bryan.freeman@maslon.com

*Attorneys for Plaintiff Cargill, Incorporated*